UNITED STATES of America,
Plaintiff-Appellee,

v.

Clifford BLOUNT, Defendant-Appellant.

No. 14558.

United States Court of Appeals
Seventh Circuit.

Nov. 23, 1964.

Rehearing Denied Jan. 7, 1965.

James D. Montgomery, Chicago, Ill., for appellant, Montgomery, Holt & Bolden, Chicago, Ill., of counsel.

Edward V. Hanrahan, U. S. Atty., Arthur L. Dunne, Asst. U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski and John Powers Crowley, Asst. U. S. Attys., of counsel.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and CASTLE, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Clifford Blount, defendant, has appealed from a judgment of conviction on the verdicts of a jury and concurrent prison sentences on each of 14 counts of an indictment. Specific violations of 26 U.S.C.A. § 7206(2) were alleged in said counts.

Defendant procured the lawyer who represented him at the trial in the district court.

There is no contention now made that there is not sufficient evidence in the record to support the verdicts and judgment below.

The evidence shows that defendant purported to act through an "organization" called the "Wonder Movement". As income taxpayers testified for the government, several stated that at defendant's urging they signed a Wonder Movement application. Defendant him-

self described these people as very illiterate. He impressed upon them how to take deductions for contributions to charities, interest payments, sales tax, etc.

Typical of the testimony of the taxpayer witnesses was that of Raymond Bolden,[1] who said that on March 30, 1962 he went to a place in Chicago and saw defendant there. It was the address of the Wonder Movement, Incorporated. Bolden talked to him about preparing his 1961 income tax return. Among other things, defendant asked if Bolden wanted to get refunds and, if so, to bring in prior returns and he would file amended returns for him. He then began to tell Bolden about the Wonder Movement and produced an application form, which Bolden filled in. Defendant told him that this organization was powerful and was designed to combat the white man.[2]

Bolden then told defendant that he had a girl friend, off and on, whereupon defendant stated she was married to him if he cared for her, and that a "marriage certificate was a white man's law". Defendant prepared Bolden's tax return and therein indicated that Bolden was married. Then, according to Bolden, defendant discussed income tax deductions. In response to a query, Bolden gave defendant the name of a Dr. Wilson but said that he did not see him very often. Defendant said "Don't tell me that, tell me you saw him yesterday". Asked if he drank whiskey, Bolden said he did from time to time and defendant said that could be a medical deduction because "doctors prescribe it all the time".

The witness testified that defendant said that "some people's returns that he had prepared had been called in by the Internal Revenue Service and he was instructing me, in the event that it should happen to me, not to give the Internal Revenue Service any information whatsoever, to tell them that he was my accountant and to turn the matter over to him".

Before leaving defendant, Bolden signed a power of attorney and an agreement to allow defendant to get Bolden's tax refund.[3] During this interview Bolden gave defendant a W-2 form which was shown to Bolden at the trial, but he said that it was different because the address was scratched out and in its place was written "c/o Wonder Movement Inc. 325 E. 58th St".

Bolden categorically denied telling defendant that he was married, that he had a daughter named Barbara, that he gave $104 to a church, or that he gave all charities $75 and had any conversation with defendant about an automobile, telling defendant that he had auto tags in the amount of $52 or a gas tax in the amount of $85, or that he had eye glasses in the amount of $37.50, or that he

1. Actually he was an employee of the Internal Revenue Service and had theretofore finished a course in law at the University of Illinois College of Law in June 1961.

2. At this time, a motion by defendant for mistrial was denied, post 4.

3. Several of such instruments are in evidence. They are headed "Application for Income Tax Returns * * * Wonder Movement, Inc." They purport to be and are work sheets and also contain an agreement authorizing the Wonder Movement to execute and file a return and also the mailing of any tax refund check in care of the Wonder Movement. They expressly recite:

"2. Inasmuch as I wish to be a live member and a member in good faith of the Wonder Movement, I hereby sign my Power of Attorney to the Wonder Movement to endorse and cash above mentioned check, and to deduct all charges, costs and expenses, membership fees, dues, and any other bona fide deductions in connection with the preparation and execution of my 1961 Income Tax Return or in connection with my membership in the Wonder Movement, Inc.

"3. I also give The Wonder Movement my Power of Attorney to negotiate my check in any way to benefit The Wonder Movement financially providing said check will be reimbursed to me at an interest rate of 3% per annum. The said check is to be reimbursed to me at $10.00 per week (including interest) until said check is totally reimbursed."

had been treated by a Dr. Rodgers or had paid Dr. Rodgers $75 for medical expense, or that he had paid $100 for union dues, or $125 on uniforms and upkeep. However, the return as prepared by defendant represented these to be facts.

In nearly every instance, each taxpayer paid defendant for preparing his tax return. In no instance did any of 15 such government witnesses receive a refund check from defendant.

1. What we have pointed out in the evidence is sufficient to clearly indicate that defendant relied upon the illiteracy of negro taxpayer witnesses and their pride of race in perpetrating a scheme to defraud any such persons who went to him confidently expecting honest treatment. He took advantage of them for his own personal gain. What he called the Wonder Movement was actually an opiate which might deaden whatever suspicions any of these victims might have entertained in regard to the propriety of what defendant was doing. Through the means which he employed he was able to secure a victim's signature on a form which enabled him to secure refund checks from the government arising out of the fraudulent preparation and filing of the respective tax returns.

■ We hold that the evidence supports the verdicts finding defendant guilty under 26 U.S.C.A. § 7206(2) which reads:

"Any person who— * * *

"(2) * * * Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document;

* * * * * *

shall be guilty * * *."

■ 2. Defendant contends that a mistrial should have been declared, because, his counsel say, he was tried before an all-white jury when the prosecution knowingly elicited testimony over objection that defendant, a negro, belonged to the Wonder Movement, whose purpose was to combat the white man.

There was evidence from which the jury could have found that defendant's use of the Wonder Movement was to prey upon, if not actually to create in the minds of his victims, a prejudice against members of the white race. Defendant's reference to the requirement of a marriage certificate, as Bolden testified, was that it was a "white man's law", thus indicating a racial prejudice which is consistent with his expressed views as to the purpose of the Wonder Movement. This prejudice was a vehicle used by defendant in perpetrating upon his victims a nefarious scheme. While defendant, testifying in his own behalf, on direct examination by his counsel, denied that he had ever been a member of such an organization, we cannot say that there was insufficient evidence to justify the court's denial of a mistrial. Although there is no proof in the record that the jury was composed exclusively of white persons, we do not think that its racial composition is germane to its consideration of the evidence in the record as to the method and persuasion used by defendant in carrying out his operations.

3. The court refused to give an instruction tendered by defendant which reads:

"You have heard the testimony from the witness Raymond Bolden that the defendant, Clifford Blount, has on a prior occasion stated that he was a part of an organization which has as one of its purposes, combating the vicious beast, i. e. the white men. You are instructed that that fact, if it be a fact, has nothing at all to do with the issues in this case and you are to disregard such testimony in its entirety.

"The innocence or guilt of the defendant is to be determined only

from the relevant and credible evidence you have heard upon this trial uninfluenced by any passion, fear or other emotion created by matters not in evidence or evidence irrelevant to the issues of this case. You are instructed that the testimony referred to in this instruction was and is irrelevant to the issues of this case, as a matter of law."

■ In this court defendant states that this instruction "was refused apparently because the quoted testimony was inaccurate." He contends, however, that the court "should have given an instruction to that effect in any event, with corrected reference to race." However, we hold that there is no such heavy duty upon any trial court. No error occurred in this respect.

4. Defendant contends that the court erred in receiving the verdicts in the absence of defendant.

The record for Friday, November 8, 1963, shows that counsel agreed that there was no objection that, upon the jury's arriving at the verdicts (in the absence of the judge), the verdicts be sealed and given to the marshal. The court then announced that he would be "in town for a while this evening * * at the Mid-Day Club." The court stated that he would not be in the Loop (downtown Chicago) much after 8:30 o'clock, so that if counsel had not gotten word by then they could go home.

Counsel for defendant stated:

"So long as we are available and Your Honor is available we will get it tonight if it comes tonight."

Whereupon the court instructed that counsel give their telephone numbers to the marshal and instructed the marshal to keep the jurors in session until about 10:30 o'clock. Counsel then left the courtroom. At 5:15 P.M. the same evening, the judge still being present, and the jury having indicated agreement on the verdicts, the clerk reported to the court:

"We left a message for him [defense counsel] to be here this evening."

The marshal tried several telephone calls in an attempt to reach defense counsel but was unsuccessful. He left messages at the offices of both counsel. The court instructed the clerk to call the place where he left the message and "tell him that he doesn't have to come in until Tuesday morning and these are the verdicts", which, according to the court, were read in open court in the presence of the court, the reporter and government counsel.

On Tuesday, November 12, 1963, at 10 A.M., in the presence of counsel for the government and defendant and his counsel, the jury was polled by the clerk. Defense counsel noted an "objection" to the manner in which the verdict was returned. He asked the court to order a presentence investigation and to extend the time for filing a motion for a new trial and in arrest of judgment, which was done.

It is obvious from these facts that, upon the submission of the case to the jury for consideration and before the judge had left his chambers, the jury announced at 5:15 P.M. that it was ready to submit its verdicts, and that an effort to reach defense counsel at the telephone numbers supplied to the court officials by him had been unsuccessful. The court received the verdicts. The jury separated and on the following Tuesday (three days later) the jurors appeared in court and were polled in the presence of defendant and counsel for both sides.

■ Only the alacrity with which defense counsel absented themselves from the courtroom when the jury retired to consider its verdicts explains why they and defendant were not there. It was no fault of the court or of the government. Under these circumstances none of defendant's rights was violated and we find no error occurred.

Defendant contends that 18 U.S.C.A. rule 43 of the Rules of Criminal Procedure was violated. That rule provides:

"The defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules. In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict. * * *"

While it has been said[4] that the first sentence of the rule is a restatement of existing law, Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011, and Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912), the rule also clearly provides that in a prosecution for such an offense as charged in the case at bar, the voluntary absence of defendant shall not prevent the return of the verdicts.

Both sides cite Diaz. However, in Diaz, at 455, 32 S.Ct. at 254, the court said:

" * * * But, where the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but on the contrary, operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present. * * *"

See also Noble v. United States, 9 Cir., 300 F. 689, 692 (1924).

We, therefore, conclude that the pertinent facts indicate that defendant waived his right to be present at the return of the verdicts. Inasmuch as his right to poll the jury was recognized and the jury was polled, we find no error in the circumstances now under consideration, which included the fact that when the verdicts were returned in court, the trial judge stated that he approved them.

5. In this court defendant's counsel, who also tried the case in the district court, contends that defendant was deprived of the assistance of counsel because attorney Gloria Wilson, who had recently represented him in this matter, had some difficulty with the district judge. Without extending this opinion by going into details, we have examined these charges minutely and find no factual basis for the contention that defendant was deprived of the assistance of counsel.

For these reasons, the judgment from which defendant has appealed is affirmed.

Judgment affirmed.

4. See note of Advisory Committee on Rules, 18 U.S.C.A. rule 43, p. 308, footnote 1.