**Byron A. PINER, Plaintiff-Appellant,**

v.

**The UNITED STATES of America, Defendant-Appellee.**

**No. 11350.**

United States Court of Appeals Seventh Circuit.

April 27, 1955.

---

4. In one case the veteran testified that the defendant "approached me about buying my rights for a home."

Raymond W. Gray, Jr., Indianapolis, Ind., for appellant.

Jack C. Brown, U. S. Atty., Robert J. Wilson, Asst. U. S. Atty., Indianapolis, Ind., Stephen Leonard, Asst. U. S. Atty., Anderson, Ind., Edgar D. Whitcomb, Asst. U. S. Atty., Mount Vernon, Ind., Don A. Tabbert, Asst. U. S. Atty., Indianapolis, Ind., for appellee.

Before FINNEGAN, SWAIM and SCHNACKENBERG, Circuit Judges.

FINNEGAN, Circuit Judge.

Arraigned and convicted on his plea of guilty without counsel, appellant Piner was sentenced June 13, 1939 to a term of 20 years for bank robbery under 12 U.S.C.A. § 588b, effective at that time. This appeal follows a hearing, June 17, 1954 on, and denial of, Piner's application under 28 U.S.C. § 2255. We use "application" in contradistinction to technical "motion" because the district judge treated a letter written to him by Piner as an invocation of § 2255.

Of those central figures participating in Piner's original disposition and sentence, only the Assistant United States Attorney survives. The district judge who then presided, court reporter, United States Attorney and Piner's codefendant are all deceased. Still available, however, were two Federal Bureau of Investigation agents who testified below in the current proceedings at which Piner had court-appointed counsel.

A significant factor, in this appeal, is the utter lack of an original record or transcript of proceedings on the arraignment now attacked by Piner through his attorney. Indeed, counsel for plaintiff and defendant have stipulated that the court reporter for the United States District Court, Southern District of Indiana, is now deceased, and:

> "That a search has been made for the—for a transcript of the arraignment proceedings in the office of the Clerk of this (ed: the court below) Court, and in the office and files of the Reporter of this Court, and no transcript of said arraignment proceedings can be located."

Consequently we, as did the judge below, are examining this case on a record reconstructed through testimony of Piner and Mr. Pfister who was the Assistant United States Attorney originally assigned to the challenged arraignment. Pfister was present during Piner's plea of guilty, conviction and sentencing.

Our analysis of the current record of proceedings under § 2255, discloses that parol evidence concerning Piner's arraignment can be conveniently summarized and compared by paralleling such evidence in this fashion:

DIRECT TESTIMONY OF PLAINTIFF-APPEL-LANT PINER

(Stenographic Trans. 59 to 61)

" * * * I came in the Court Room. I'm rather vague about all the actual proceedings. I know what took place, but in the order that they took place I'm not sure. I came in to the Court Room. I was asked my name. I—the District Attorney, he started talking about my past record. And the *judge asked me how I— asked me if I was—had counsel. I said No. He asked me if I wanted counsel, and I said no. And he asked me if I understood the charge. I said yes.* He said, 'How do you plead?' I said, Guilty.' He asked my co-defendant Herring how he pled. He said he pled guilty. And we were sentenced right there. Now, that is all that was taken place in the Court room. * * *

"Q. * * * did he ask Herring the same questions he asked you? A. That's right. * * *

"Q. Was a copy of the indictment served upon

DIRECT TESTIMONY OF PAUL A. PFISTER, FOR-MER ASSISTANT U. S. ATTORNEY

(Stenographic Trans. 81–82, 84)

"The two defendants were brought before the Bench in this Court Room, Judge Robert C. Baltzell, presiding. Judge Baltzell had the original indictment in his hand. He asked first of all, which is Piner and which is Herring. Then he interrogated Piner and Herring separately. I mean, both standing before the Bench side by side. He said, 'Your name is Byron Piner.' Mr. Piner said it was. 'What's your age?' Piner replied * * * He said, 'Do you have a lawyer?' Mr. Piner said, 'No' and then Baltzell said, 'Do you want one?' Mr. Piner said, 'No'. Judge Baltzell said, 'You understand under the law you are entitled to the appointment of counsel by the Court, if you do not have counsel of your own choice?' Piner said, 'Yes.' Judge Baltzell said, 'You know what you are charged with?' Piner said, 'Yes.' Judge Baltzell had the indictment in his hand, and he said, 'You are charged in an indictment with robbing a bank at—' (as I remember) 'at Linden, Indiana, in Montgomery County, and you are charged in the second count of the indictment with taking a stipulated amount of money and

FINDINGS OF FACT No. 3

Made in the proceedings under § 2255. (T. R. —unnumbered. Findings of Fact and Conclusions of Law, dated October 21, 1954)

"That at said arraignment, the late Judge Baltzell in substance, asked of Byron A. Piner his age, to which Piner replied 'Twenty-seven.'

"Judge Baltzell then asked, 'Do you have a lawyer?'

"To this question Piner replied, 'No'.

"Judge Baltzell then asked, 'Do you want one?'

"Piner replied, 'No.'

"Judge Baltzell then said, 'You understand under the law, you are entitled to the appointment of counsel by the Court if you do not have counsel of your own choice?'

"Piner replied, 'Yes.'

"Judge Baltzell then said, in substance, 'You are charged in an indictment with robbing a bank at Linden, Indiana, in Montgomery County, and you are charged in the second count of the indictment with taking a stipulated amount of money and funds from the bank. Do you know what it means to enter a plea to an indictment?'

"Piner said, 'Yes.'

"Judge Baltzell then said, 'That means if you enter a plea of guilty to the indictment, you did what is charged in the in-

you at anytime? A. No sir * * *

"Q. Did he read the indictment to you? A. No sir * * *" [2]

funds from the bank.' Judge Baltzell said, 'Do you know what it means to enter a plea to an indictment?' Mr. Piner said, 'Yes.' Judge Baltzell said 'That means if you enter a plea of Guilty to the indictment, you did what is *charged* in the indictment. *If you enter a plea of Not Guilty it means that you did not know what is charged* in the indictment.' [2]

"The Court: [1] May I inquire, was the indictment ever read to him?

"The Witness: Not in my presence, your Honor. The Judge stated the substance of the charge in the count. The indictment was not read in its entirety in open court. * * *"

"Q. Was there a Reporter in the Court Room that day Mr. Pfister? A. I think not."

"The Court: There was not a Court Reporter? The Witness: No, Your Honor. There had not. It had not been the rule of the Court to have a Reporter present at the arraignments in criminal cases up until about the year 1943. We had a rather unfortunate situation occur, and I recall the case distinctly * *. But I am rather certain that there was no Reporter in this instance."

dictment. If you enter a plea of not guilty, *it means that you do not know what is charged* in the indictment,' " [2]

---

1. Referring to the district judge hearing the current proceedings under § 2255.

2. Italics supplied.

■■ Piner's current version of his 1939 arraignment must be examined against the backdrop of the following passage in Johnson v. Zerbst, 1938, 304 U.S. 458, 468–469, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461:

"It must be remembered, however, that a judgment can not be lightly set aside by collateral attack, even on *habeas corpus*. When collaterally attacked, the judgment of a court carries with it a presumption of regularity. Where a defendant, without counsel, acquiesces in a trial resulting in his conviction and later seeks release by the extraordinary remedy of *habeas corpus*, the burden of proof rests upon him to establish that he did not competently and intelligently waive his constitutional right to assistance of Counsel. If in a *habeas corpus* hearing, he does meet this burden and convinces the court by a preponderance of evidence that he neither had counsel nor properly waived his constitutional right to counsel, it is the duty of the court to grant the writ."

In this situation the district judge was called upon to recapture and evaluate Piner's state of mind on June 13, 1939. Conceivably the interim years, since then, might well have colored or distorted the recollections of all witnesses heard below. Piner, who had ten years of schooling, was 27 years old when he plead guilty before Judge Baltzell. Though appellant had never been in a Federal Court prior thereto, he had been convicted in state courts of forgery, reckless driving and disorderly conduct. These convictions, in 1929, 1930 and 1931, rested on pleas of guilty entered without counsel.

■ The hard core of this appeal is whether Piner relinquished his constitutional right to counsel with full appreciation and realization of what he was doing. We think he did.

Piner's own direct testimony, already subjected to tabular analysis above, shows he admits there was an opportunity to have counsel if "wanted." But his direct testimony goes further, for when he was asked by his court-appointed counsel (during these § 2255 proceedings) about some conversation just prior to arraignment with Kenneth Pettijohn, Special Agent of the F. B. I., Piner replied, and the transcript shows:

"A. I asked Mr. Pettijohn—I sent word to him that I would like to see him, and I asked him a question. If—if I should choose not to plead guilty and stand trial, would it be possible for me to be sent, upon conviction, if I were convicted, would it be possible for me to be sent to some different institution other than my co-defendant. I was advised by Mr. Pettijohn that that was—without his—he had no jurisdiction over that, that it was up to the Attorney General of the United States.

"Q. Now, was there any one present at that conversation? A. He and I.

"Q. Just you and Mr. Pettijohn? A. That's right.

"Q. Is that all of the conversation that you had with Mr. Pettijohn at that time? A. Yes sir."

Such thinking reported by Piner himself, as part of his burden, goes far toward cutting ground from under the position urged on appeal. Certainly Piner had contemplated entering a plea of not guilty and standing trial. He has shown an awareness not only of alternative pleas but the method of obtaining trial. It is also clear from the quoted excerpt that Pettijohn said nothing prejudicial. On cross-examination by government counsel there is, again, some similar manifestation of Piner's thought processes, for the stenographic record shows:

"Q. Let me rephrase that, then. Was your question, that if you chose to stand trial would you be sent, on conviction, to the same penitentiary as your co-defendant?

"A. My question was this: If I chose to stand trial and was convicted, would it be possible for me to go

to one institution and him to another institution—a separate institution, because I—

"Q. In other words, Mr. Piner, at the time you hadn't made up your mind, as yet, as to what plea you were going to enter?

"A. Not directly."

Appellant cites and relies upon United States v. Wantland, 7 Cir., 1952, 199 F.2d 237, 238 but an examination shows that in his petition Wantland alleged *"inter alia* that he was insane at the time of the offense alleged against him and at the time of the plea and sentence, and that within five days after he was sentenced to imprisonment and while confined in a federal prison, mental tests were begun upon him by psychiatrists, and that on September 19, 1950, the Board of Examiners at the federal prison found him insane." The district judge confronted with those allegations, and others showing want of counsel denied Wantland's motion under 28 U.S.C. § 2255. We reversed the District Court and remanded that cause "for further and not inconsistent proceedings." Clearly *intelligent* waiver of counsel in the Wantland case virtually pivoted on the literal meaning of "intelligent." In Wantland we quoted with approval certain language from Cherrie v. United States, 10 Cir., 1949, 179 F.2d 94, 96. There the Tenth Circuit prescribed a minimum standard for trial judges advising defendants concerning right to counsel, stating, in part: " * * * that if he [defendant] is unable to employ counsel, it is the duty of the court to appoint, and the court will appoint, counsel for him", Ibid, 96. But Judge Phillips qualified his stated minimum by saying:

"Of course, if the defendant is learned in the law, or it otherwise clearly appears that he knows his constitutional rights, *a less inquiry may suffice."*

Clearly, Piner knew he had a right to counsel; could have a trial; that the court would appoint counsel for him if he, Piner, desired one. But we remain unpersuaded that Piner thought Judge Baltzell was merely speaking of locating an attorney as distinguished from providing free court-appointed counsel. The choice between trial on the merits and a plea of guilty pivoted on Piner's fear of his co-defendant, not financial ability to retain counsel. We also think it fair to say that his decision to plead was stimulated by other than financial considerations.

We find no sound reason for overturning the findings of fact and conclusions of law entered by the District Judge, October 21, 1954, who apparently devoted considerable time and attention to Piner's assertions long prior to hearing under § 2255 (See e. g. Piner's 11 page letter dated February 26, 1954 to Judge W. E. Steckler, contained in the record certified to this Court, which mentions various other motions and communications).

Raymond W. Gray, Jr., Esq. has unselfishly rendered professional services, as court-appointed counsel, meriting our commendation.

The judgment entered below, October 21, 1954, is affirmed.

Affirmed.