UNITED STATES of America, ex rel.
SECURITIES AND EXCHANGE
COMMISSION, Plaintiff-Appellee,

v.

Robert H. BILLINGSLEY,
Defendant-Appellant.

No. 84–1165.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 3, 1984.

Decided June 26, 1985.

Coffey, Circuit Judge, filed opinion concurring in part and dissenting in part.

Erick Summergrad, S.E.C., Washington, D.C., for plaintiff-appellee.

Robert E. Burke, McHenry, Ill., for defendant-appellant.

Before ESCHBACH, COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Robert Billingsley appeals from his criminal contempt conviction following a jury trial for violating a 1965 district court order enjoining him from offering or selling unregistered, nonexempt securities. Billingsley bases his appeal on two grounds only: first, that the court below improperly found him fit to stand trial by placing the burden of proof on him rather than on the government, and second, that the court erred in instructing the jury to continue deliberating after the court had unsuccessfully tried to contact defendant's

counsel concerning a question submitted by the jury foreman. We find the second ground to be without merit, but find the first sufficient to require a remand to the district court on the question of defendant's fitness to stand trial.

## I. Facts

The defendant does not challenge the sufficiency of the evidence, so the factual and procedural history leading to his conviction can be summarized briefly. In 1965, Billingsley consented to an order, entered by Judge Juergens in the Eastern District of Illinois, permanently enjoining him from offering or selling unregistered securities that are not exempt from registration under the federal securities laws. *S.E.C. v. Basin Oil Development Co.*, No. 65–47 (E.D.Ill. Apr. 9, 1965). Since this order was entered, Billingsley nevertheless has continued selling unregistered securities. Indeed, in 1969 he pleaded guilty before Judge Juergens to being in criminal contempt of the 1965 order, and was sentenced to three years probation (which was suspended after nine months). *United States v. Basin Oil Development Co.*, No. 68–49 (E.D.Ill.1969).

In April 1982, the Securities and Exchange Commission ("S.E.C.") initiated the present case by filing with Judge Juergens, now in the Southern District of Illinois, an application for an order to show cause why Billingsley should not again be held in criminal contempt of the 1965 order. The application charged that since January 1978 Billingsley had been selling unregistered securities in the form of undivided fractional interests in oil and gas leases. Judge Juergens issued the order to show cause in September 1982, and the case was subsequently transferred to Judge McGarr in the Northern District of Illinois in late October 1982.

On September 14, 1983, four days before trial was finally set to begin,[1] Billingsley requested a hearing on his fitness to stand trial. The court granted his request and held such a hearing on October 6, 1983. As described in greater detail below, defendant's counsel and a psychiatrist testified at the hearing that the defendant was unfit for trial, while two lay witnesses testified that the defendant did not appear to suffer any mental disability that would render him unfit. After hearing this testimony, Judge McGarr, addressing defendant's counsel, stated from the bench:

> what I have heard, to this point, suggests to me that I do not find your burden of proving his lack of competence to stand trial having been met. But I have some reservation on the subject, which would cause one to want to hear some other expert, other than the doctor we heard this morning.

The court therefore asked the government to have the defendant examined by another doctor, and stated that the court would hold another hearing if the defendant desired to cross-examine the other doctor or to introduce further evidence of unfitness.[2] The psychologist who thereafter examined Billingsley for the government submitted a written report finding him fit, and the defendant did not request another hearing. Accordingly, the court issued a handwritten minute order on November 4, 1983, stating, "[c]ourt finds that defendant … is presently psychologically fit to stand trial," and setting trial for November 28.[3]

---

1. The defendant earlier had obtained a continuance of the trial date from May 16 to July 5, 1983, based on representations from a psychiatrist and a medical doctor that he suffered from serious health problems, including high blood pressure and emotional disturbances.

2. The court's minute order entered on October 6 basically restated these points and described its assessment of the evidence taken at the hearing that day as follows (quoted verbatim): "Court finds that defendant Robert H. Billingsley has failed to meet burden of insanity."

3. On November 21, defendant again moved to continue the trial based on his poor health. He supported his motion with several recent telegrams from a medical doctor stating that he was being evaluated for various cardiovascular problems, one of which stated that "trial delay is terribly important to avoid potential medical catastrophy." The court denied the defendant's motion.

The trial commenced on November 28, 1983, and lasted for about seven days. The government produced a plethora of testimonial and documentary evidence of Billingsley's activities in promoting and selling unregistered and largely worthless interests in oil and gas leases. An accountant for the S.E.C., for example, testified from his investigation that Billingsley had sold approximately $2.5 million in such interests to about 128 investors in nine states during a four and one-half year period ending in December 1982. Billingsley's first defense to these charges was that his sales of securities did not violate the terms of the 1965 order because they were covered by the intrastate or private offering exemptions from the registration requirements of the federal securities laws. His second and clearly more substantial defense, however, was that even if he did violate the terms of the 1965 order, he did not do so knowingly and willfully and thus was not in criminal contempt of the order.

In support of this latter defense, Billingsley himself took the stand and professed his good faith belief that his sales of securities did not violate the 1965 order. More importantly for present purposes, Billingsley offered testimony at trial from the psychiatrist who testified as to Billingsley's unfitness at the fitness hearing, along with another physician and a lay witness, to support his contention that he suffered from some mental disability that prevented him from understanding or complying with the injunction. The government rebutted this testimony by offering testimony from the psychologist who previously had given the written report concluding that Billingsley was fit, from another psychologist who performed further tests on the defendant, and from various lay witnesses including investors who had purchased securities from Billingsley. Therefore, the testimony given at trial focused further on Billingsley's mental capacity.

The case was ready for submission to the jury on the afternoon of December 8. After instructing them on the relevant law, the judge explained to the jurors that they could communicate with him during their deliberations by submitting to the Marshal a written note signed by the foreperson, whereupon the judge "will discuss it with the attorneys and we will respond in whatever way is appropriate." Further, the judge reassured the jurors that they would not be held overnight by stating: "If you do not reach a unanimous verdict before 4:30 or quarter to 5:00 tonight, we will just ask you to resume your deliberations tomorrow morning."

At approximately 3:10 P.M., the jury began deliberating. Counsel for the defendant and the government then had a brief conference on the record in which defendant's counsel waived his and defendant's presence during deliberations and at the reading of the verdict, assuming the jury reached a verdict that afternoon. The judge also asked defendant's counsel to give the Marshal a phone number where he could be reached for consultation if the jury should submit a question to the court, and counsel did so.[4] Approximately forty-five minutes later, after defendant's counsel had departed, the jury did submit a question to the court which read: "May we have the exemptions that the defendant alleges?" The judge attempted to reach defendant's counsel by phone, but to no avail. The judge thus consulted in chambers with the two attorneys for the government who were present, and then told the Marshal to instruct the jurors simply to continue their deliberations based on the instructions they had been given previously.

Soon thereafter, the jury returned a verdict of guilty, and the court left a message so notifying defendant's counsel at the phone number he had provided to the court. Billingsley then moved for a new trial on the same grounds that he now argues on appeal. At a hearing held on January 17, 1984, the court denied the motion for a new trial, and sentenced Billingsley to three

---

**4.** The judge also confirmed with counsel what he had told the jury: that the jury would be dismissed at 4:45 P.M. if they had not reached a verdict.

years imprisonment with the provision that he could be released on parole at any time within the discretion of the Parole Commission if he should develop health problems. *See* 18 U.S.C. § 4205(b)(2) (1982). Finally, the judge denied Billingsley's motion for a stay of his sentence pending appeal, expressing his concern that Billingsley would continue to engage in illegal and dishonest conduct if he remained free.

We will begin by discussing our bases for rejecting Billingsley's contentions concerning the court's response to the question from the jury, and then will proceed to a more detailed delineation of our reasons for concluding that a remand is necessary on the issue of Billingsley's competency to stand trial.

## II. The Jury Communication

 It is clear that a criminal defendant has a right to be present during all stages of his trial—including the jury deliberations—and that this right can be abridged when a trial judge communicates with the jury without first contacting the defendant or his counsel. Fed.R.Crim.P. 43(a); *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975). It is also clear, however, that the defendant can waive this right, Fed.R. Crim.P. 43(b)(1), and that even when a trial judge does erroneously communicate with the jury without notifying the defendant, such error can sometimes be considered harmless. *United States v. Silverstein,*

732 F.2d 1338, 1348 (7th Cir.1984); *United States v. Clavey*, 565 F.2d 111, 119 (7th Cir.1977), *modified en banc on other grounds*, 578 F.2d 1219 (7th Cir.1978) (per curiam). *See also Rogers v. United States*, 422 U.S. at 40, 95 S.Ct. at 2095. This case requires us to apply these principles to a rather difficult and disconcerting fact situation.

## A. Waiver

The circumstances surrounding the jury's deliberations in this case immediately raise the question of whether Billingsley waived his right to be present through his counsel, Robert Burke. During the conference with the judge and opposing counsel held after the jury began deliberations, Burke plainly purported to waive Billingsley's as well as his own right to be present at the reading of the verdict and to poll the jury on that verdict.[5] Moreover, there was no particular reason for the court to doubt Burke's representations that Billingsley intended to waive these rights since Burke stated at the conference that he had told Billingsley that the jury might reach a verdict that day, and since Billingsley had previously been absent at several points during the trial.[6] Finally, Burke himself cannot be heard to complain that he was unfairly deprived of a chance to respond to the jury's inquiry, because he could not be

---

**5.** The pertinent portion of the transcript reads as follows:

MR. BURKE: Is it necessary that I be present for the reading of the verdict?

THE COURT: It is not. If you wish to waive your presence, that would mean you would waive the polling of the jury.

MR. BURKE: Yes, Judge.

THE COURT: And we will tell you what the verdict is.

What about Mr. Billingsley's presence for the verdict; does that constitute a problem?

MR. BURKE: No Judge. I would waive that also. I told him that we would be proceeding today and might well get a verdict.

THE COURT: All right. Let's assume, then, if we get a verdict today, that I would expect you, Mr. Burke and Mr. Billingsley, here tomorrow for the entry of the judgment on the verdict. I will open the verdict and announce it, if we get one

today, and your presence and that of Mr. Billingsley will be excused.

All right. Now, there is one other problem, Mr. Burke; if the jury sends out a question, I usually like to confer with the attorneys on it. Is there anywhere we can reach you, by phone, in case we have such a problem?

MR. BURKE: Yes Judge.

THE COURT: Let the Marshall know, and he will call you if we get a question.

**6.** For example, Billingsley apparently was absent at some point during the first day of trial. Before the government swore in its first witness, the judge questioned Burke about Billingsley's presence, stating further: "I would like him here. If he intends not to be here, I want to be sure that he understands his right and waives it, on the record." Billingsley entered the courtroom just after this admonition.

reached at the phone number that he left with the court precisely for that purpose.[7]

We are therefore tempted to dispose of defendant's contention simply by finding his right to be present under Rule 43 waived, as we did some time ago on strikingly similar facts in *United States v. Blount*, 339 F.2d 331 (7th Cir.1964). As in the instant case, the trial judge in *Blount* instructed both counsel after the jury began deliberating to leave phone numbers where they could be reached. In *Blount*, however, the jury did not submit a question to the court, but rather returned a verdict soon after beginning its deliberations. The trial judge thereupon sought to contact defendant's counsel at the number he provided, but after failing in this effort proceeded to read and approve the jury verdicts in open court. In rejecting the defendant's contention that the trial court erred in receiving the verdicts in his absence, the court stated:

> Only the alacrity with which defense counsel absented themselves from the courtroom when the jury retired to consider its verdicts explains why they and defendant were not there. It was no fault of the court or of the government. Under these circumstances none of defendant's rights was violated and we find no error occurred.

*Id.* at 334. At first glance, this language seems to apply perfectly to the present case. *See also United States v. Friedman*, 593 F.2d 109, 121 (9th Cir.1979) (defendant waived his presence at receipt of verdict and polling of jury "by disobeying the court's instructions to remain near enough to the courthouse to return within fifteen minutes of receipt of notice of the return of the jury").

■ Still, we are troubled by the fact that there is nothing in the record from the mouth of the defendant himself waiving his right generally to be present and represented by counsel during jury deliberations, or specifically to respond to questions propounded by the jury. This circuit previously stressed the significance of these rights in *United States v. Burns*, 683 F.2d 1056 (7th Cir.1982) (per curiam), *cert. denied*, 459 U.S. 1173, 103 S.Ct. 821, 74 L.Ed.2d 1018 (1983). In *Burns*, we noted the Supreme Court's holding in *Rogers* that questions from a jury should be answered in open court and defendant's counsel should be given an opportunity to be heard before the court responds to them. *Burns*, 683 F.2d at 1058 (discussing *United States v. Rogers*, 422 U.S. at 39, 95 S.Ct. at 2094). More to the point, we stated: "In the absence of a clear waiver by the defendant *personally*, we feel the district courts in this Circuit should make every effort to observe the procedures endorsed in the *Rogers* opinion." *Burns*, 683 F.2d at 1058 n. 1 (emphasis added). Because the right to respond to jury communications is so important, and because this right ultimately belongs to the criminal defendant himself, we reaffirm that the preferred practice is either to follow the procedures outlined in *Rogers*, or to obtain a clear and knowing waiver from the defendant on the record. Thus, rather than permitting defense counsel alone to waive both his own and the defendant's presence during jury deliberations—and thereby to deny the defendant any opportunity to respond to jury communications—the preferred procedure would be to hold an on-the-record hearing in which the trial judge could explain to the defendant his rights, and the defendant could personally waive these rights if he so wished. Under the peculiar circumstances

---

7. Burke informed the panel at oral argument that the phone number he left with the court was that of his office and that he was enroute there when the court phoned him regarding the jury communication. Indeed, Burke admitted that he did not arrive at his office until after 5:00 P.M., which was past the time that both counsel and the court had agreed the jury would be released that afternoon. *See supra* note 4. Nevertheless, nothing in the record indicates that Burke told the judge or opposing counsel that he would be unavailable for an hour and a half while the jury was deliberating. Burke's conduct hardly manifests concern with preserving the right to respond to jury communications.

of this case, we therefore hesitate to rest our decision on a waiver theory.[8]

## B. Prejudice

■ We are nevertheless confident from a review of the record that Billingsley was not prejudiced by the trial court's direction that the jury continue deliberating in response to the question concerning Billingsley's claimed exemptions. By so directing the jury, the court maintained strict neutrality and avoided the dangers inherent in communicating with the jury on substantive matters in the absence of defendant and his counsel. *Cf. Burns,* 683 F.2d at 1058–59 (discussing such dangers and finding reversible error where the trial judge entered the jury room and explained to the jury the "overt act" requirement in a conspiracy trial without giving prior notice to defendants or their counsel).

In cases where trial judges have responded to a jury query in a similarly neutral and nonsubstantive manner, courts have found no prejudice to the defendant resulting from the response. *See, e.g., United States v. Ford,* 632 F.2d 1354, 1378–79 (9th Cir.1980) (no possibility of prejudice where judge permitted transcript of testimony to be read to jury in absence of defendant, but "made no comments on the evidence and gave no additional instructions"), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981); *United States v. Higgans,* 507 F.2d 808, 813 (7th Cir.1974) (no prejudice where trial judge simply denied jury's request for a transcript of all the testimony); *United States v. Reynolds,* 489 F.2d 4, 7–8 (6th Cir.1973) (no prejudice where trial judge responded to jury's question regarding a particular fact by saying simply that the jury "could have no further

information"), *cert. denied,* 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974). Indeed, in one of the very cases cited by the defendant, the court found it to be harmless error for a trial judge to respond to a deadlock note from a jury by merely instructing them to continue deliberating. *United States v. Rodriguez,* 545 F.2d 829, 830–31 (2d Cir.1976), *cert. denied,* 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

Billingsley initially sought to establish a reasonable possibility of prejudice in this case by arguing that the judge's response implicitly threatened the jury that they would be held over if they did not reach a verdict that day. This contention is based on some ambiguity in the record over whether the jurors were told only to continue deliberating (as the government assumes), or whether they were also told that they would be re-instructed the next morning if they could not reach a verdict (as Billingsley assumes). Even if Billingsley's assumption is correct, the judge's prior, very specific statements to the jury that they would not be held later than 4:45 P.M. that day vitiates any danger that the jurors would fear being held over.

Defendant's further contention that he was prejudiced because the court's failure to answer the jury's question left the jury confused about an issue "critical to the defense" is also without merit.[9] Billingsley's defense based upon the intrastate or private offerings exemption was supported solely by his own bare assertions, which were rebutted by uncontradicted documentary and testimonial evidence introduced by the government. Moreover, while further explanation of the specific exemptions Bill-

---

**8.** This is not an implicit finding that the court below committed error in this case by not obtaining a waiver from Billingsley himself. The judge expressly recognized the desirability of obtaining an on-the-record waiver from Billingsley when he was absent during the first day of trial, and Billingsley's requested absences thereafter might have made it difficult (if not impossible) to follow the preferred practice in this case. *See supra* note 6 and accompanying text. Since we cannot resolve these matters from the record, we simply decline to decide the jury communication issue on the ground of waiver

alone. *Cf. United States v. Ford,* 632 F.2d 1354, 1379 (9th Cir.1980) (proceeding to harmless error analysis where "[a]lthough the record suggests that [defendant's] absence was voluntary, we cannot conclusively determine that it was."), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981).

**9.** The court fully instructed the jury concerning Billingsley's claims that his sales came within the intrastate or private offering exemptions, and that he had a good faith belief to that effect.

ingsley had claimed might conceivably have aided the jury in evaluating his more substantial good faith defense, the jury had heard sufficient and more directly relevant evidence with which it could evaluate that defense, and further instruction on the claimed exemptions might just as easily have confused rather than enlightened the jury.

In sum, we find no possibility of prejudice to Billingsley resulting from the trial court's instruction to the jury and, therefore, any error that occurred was harmless.

### III. Fitness

Our touchstone in deciding this issue is *United States ex rel. Bilyew v. Franzen,* 686 F.2d 1238 (7th Cir.1982). *Bilyew* arose from a habeas petitioner's claim that he was denied constitutional due process when an Illinois trial court required him to prove his unfitness for trial. At the time he was convicted, Illinois had a statute in force that expressly so placed the burden, although the Illinois Supreme Court soon thereafter declared the statute unconstitutional in *People v. McCullum,* 66 Ill.2d 306, 5 Ill.Dec. 836, 362 N.E.2d 307 (1977). *See Bilyew,* 686 F.2d at 1238. Despite the burden of proof statute, the trial judge made no reference to this burden in her oral opinion finding Bilyew fit to stand trial. *See Bilyew,* 686 F.2d at 1243. The evidence on Bilyew's fitness was close insofar as the four experts who testified split evenly on the issue. *Id.* at 1239. On these facts, the Illinois Supreme Court (reversing the Illinois Appellate Court) affirmed Bilyew's conviction, finding that "the record contains no specific indication that the burden of proof was a factor in the trial judge's conclusion." *People v. Bilyew,* 73 Ill.2d 294, 304, 22 Ill.Dec. 736, 740, 383 N.E.2d 212, 216 (1978). On habeas review, the United States district court, without deciding the constitutional issue, similarly found any error in allocating the burden to be harmless. *Bilyew,* 686 F.2d at 1244.

In an opinion by Chief Judge Cummings, this court reversed, declaring: "There is little question that the Fourteenth Amendment requires the State or federal prosecution to shoulder the burden of proving that the defendant is fit to stand trial once the issue of unfitness has been properly raised." *Id.* at 1244. The court then described the relevant test for a defendant's fitness: "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* at 1244–45 n. 1 (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960)). After stating these generally well-established propositions, the court shifted its discussion to what it labeled as the "real question" in the case: "whether misallocation of the burden of proof can be overlooked as 'harmless error.'" *Bilyew,* 686 F.2d at 1245. It is this discussion in *Bilyew* that guides our analysis of the present appeal, which raises precisely the same question.[10]

Stressing the fundamental nature of the prohibition against trying unfit defendants,[11] the court stated that "the harmless error question is whether there is a *reasonable possibility* that by using a constitutional burden of proof the trial judge would have found Bilyew unfit." *Id.* (emphasis added). The court held that the evidence was close enough that Bilyew clearly could show such a reasonable possibility, and therefore that the misallocation of the burden on fitness was not harmless error. *Id.* at 1246. In the portion of the opinion that perhaps most graphically reveals the logic underlying the decision, the court in *Bilyew*

---

**10.** The government in this case concedes, as it must, that the prosecution is required to bear the burden of proving the defendant's fitness for trial by a preponderance of the evidence.

**11.** For this reason, the court rejected a standard that would characterize as harmless an error in allocating the burden of proving fitness provid-

ed that the allocation did not affect the determination of the defendant's actual guilt. As the court stated forcefully: "the trial of an unfit defendant cannot be upheld simply because we feel sure that he is in fact the culprit." *Bilyew,* 686 F.2d at 1245.

rejected the reasoning employed by the Illinois Supreme Court to reach a contrary result. *Id.* at 1245–46. Specifically, it rejected the Illinois Supreme Court's reliance on a statement in a Third Circuit opinion that "[a]llocation of the burden of proof will be significant, in theory at least, only in the rare case when, assuming the evidence is weighed by the preponderance of evidence standard, the conflicting evidence is in equipoise in the mind of the fact finder." *See People v. Bilyew,* 73 Ill.2d at 300–01, 22 Ill.Dec. at 739, 383 N.E.2d at 215 (quoting *United States v. DiGilio,* 538 F.2d 972, 988 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977)).

This court criticized the Illinois Supreme Court's approach as misconceiving the significance of the burden of proof:

> We doubt the soundness of the 'theory' that concludes that an unconstitutional burden of proof can be disregarded unless the trial judge has made a point of stating that he or she has relied upon it. Even if cases where the burden of proof makes a difference are in fact rare, there is no need to preclude a defendant from pointing to facts in the hearing record to support his argument that the burden of proof did make a difference. Surely the hearing record, in conjunction with the trial judge's opinion, is a more reliable indicator of the closeness of the question than merely this trial judge's listing or failure to list which procedural statutes she relied on in reaching her decision.

*Bilyew,* 686 F.2d at 1246. *See also id.* at 1247–48 (appendix to opinion criticizing assumption that burden of proof is important only in rare cases, and concluding that "[i]f the evidence is closely balanced, then common sense indicates there is a reasonable possibility that who bears the burden of proof will determine the outcome."). Thus, *Bilyew* expresses this court's commitment to exercising special care before adopting a harmless error analysis where there is some indication in the record or elsewhere that a criminal defendant was unconstitutionally required to prove his own unfitness for trial. *See United States ex rel. Phillips v. Lane,* 580 F.Supp. 839, 850–52 (N.D. Ill.1984) (applying *Bilyew*).

Finally, *Bilyew* prescribes the proper procedure in this circuit for disposing of criminal appeals upon a finding that the burden of proving fitness was misallocated and that such error was not harmless. *See* 686 F.2d at 1246–47; *United States v. Johns,* 728 F.2d 953, 957–58 (7th Cir.1984) (adopting essentially the same procedure on federal criminal appeal). The case should be remanded for an initial determination by the court as to "whether it is still possible to hold a meaningful retrospective hearing to find whether [the defendant] was fit to stand trial at the time of the [original] proceedings." *Bilyew,* 686 F.2d at 1246. If so, the court should conduct such a *nunc pro tunc* hearing properly placing the burden on the government to prove fitness. *Id.* at 1247.

With *Bilyew* as our guide, we therefore proceed to an analysis of Billingsley's allegation that the district court unconstitutionally required him to prove his unfitness for trial.

## A. Misallocation of the Burden

Notwithstanding the court's two statements at the time of the fitness hearing to the effect that Billingsley carried the burden of proving his unfitness, the government now contends that the court correctly allocated the burden to the government when it ultimately found him fit to stand trial. This contention rests first on the absence of any reference to the burden of proof in the court's minute order of November 4, which simply stated that the court found the defendant "presently psychologically fit to stand trial." In addition, the government points to the court's denial of the motion for a new trial, in which the defendant expressly argued that the burden of proof on fitness had been misallocated. Under the government's theory, the court's denial of a post-trial motion specifically raising the burden of proof issue might be read as a statement either that the burden on fitness had not been allocat-

ed to the defendant, or that even if the burden had been mistakenly so allocated, the defendant would be found fit for trial even if the government were required to prove the defendant fit by a preponderance of the evidence.

■ We do not doubt the general proposition that a trial court can correct its previous misstatements concerning the burden of proof by indicating in its final oral or written ruling on fitness, or perhaps in its ruling on a post-trial motion,[12] that the burden was actually allocated to the government. Nevertheless, the statements made by the court after the fitness hearing in this case, which explicitly placed upon Billingsley the burden of proving his unfitness, cannot be vitiated by two subsequent rulings that make no mention whatsoever of who carried the burden of proof on fitness. Indeed, the court's oral ruling on Billingsley's motion for a new trial did not mention the question of fitness at all, but merely stated generally that the motion "does not state adequate grounds and ... is denied." Assuming that this record leaves some ambiguity as to whether the burden was ultimately misallocated,[13] the logic of *Bilyew* precludes us from constru-

ing such ambiguity against the defendant when we are dealing with a potential error of constitutional magnitude.

Therefore, as in *Bilyew*, we must carefully review the record on the defendant's fitness to assess whether there is a reasonable possibility that he would have been found unfit had the burden been allocated properly.

## B. Evidence on Fitness

■ The district court had a rather substantial body of expert and lay testimony before it with which to judge the defendant's ability to consult with counsel and his understanding of the charges against him, and thus his fitness for trial. This testimony included not only that given at the pretrial fitness hearing, but also that given at trial on the question of Billingsley's ability to understand and comply with the 1965 order,[14] along with Billingsley's own testimony at trial. Viewed in terms of the number of witnesses who testified, the expert testimony was evenly split as to Billingsley's fitness, while the lay testimony leaned toward the conclusion that Billingsley was fit to stand trial. Despite the

12. For example, since the proper disposition of cases in which the burden was misallocated to the defendant is a remand to the district court to conduct a meaningful *nunc pro tunc* fitness hearing if that is possible, a post-trial ruling by the district court in such a case that the defendant would be found fit even if the burden was on the government might be sufficient to render any previous error harmless.

13. Taken by itself, the trial judge's statement at the October 6 hearing suggesting that Billingsley had the burden of proving his lack of competence might plausibly be characterized as an "inadvertent 'slip of the tongue.'" *See post* at 1035. However, in light of the fact that the trial court also entered a minute order that same day referring to Billingsley's "burd[e]n of insanity," *see supra* note 2, we cannot agree with the dissent that "[t]here is no question in this record, and indeed there never was any question before the trial court, that the Government carried the ultimate burden of persuasion on Billingsley's competency to stand trial." *See post* at 1035.

Against the background of these oral and written statements, we also cannot agree with

the dissent that the trial judge's act of ordering the government to have Billingsley examined by another psychological expert after the October 6 hearing necessarily suggests that the judge believed that the government carried the burden of proving Billingsley's competency. *See post* at 1035. The judge might just as easily have reasoned that while he tended to believe after the hearing that Billingsley had failed to fulfill *his* burden of proving incompetency, he was reluctant to so rule until the government provided at least one expert opinion to contradict the testimony of Dr. Ziporyn at the hearing.

14. The expert and lay testimony given at trial technically relates to Billingsley's understanding of the 1965 order at the time he was engaging in the proscribed transactions, not to his fitness at the time of trial. Nevertheless, because this testimony was based largely on the witnesses' relatively recent observations or evaluations of the defendant, and because the defendant's prior understanding of the 1965 order would be pertinent to his understanding at trial of the charges against him, we review the trial testimony in determining whether there is a reasonable possibility that the trial court would have found the defendant unfit.

government's assertions to the contrary, Billingsley's own testimony, so far as we can judge it from the record alone, is ambiguous as to fitness: although Billingsley did not engage in any behavior that would clearly indicate serious psychological problems and was able to give some meaningful and relevant testimony, he sometimes seemed unusually confused on the stand and gave a number of rambling, unresponsive answers.[15]

Given the ambiguity in the record as to Billingsley's testimony, and given our lack of access to such important indicators as his demeanor on the stand, we do not consider this testimony as support for either fitness or unfitness. Because we do have some capability to assess the other expert and lay testimony on fitness based on the record, however, we proceed to review and summarize this testimony. *Cf. Bilyew*, 686 F.2d at 1239–43 (detailed review of testimony on fitness).

### 1. Expert Testimony

The fairest way to summarize the conflicting expert testimony on Billingsley's fitness for trial is to say that the experts generally agreed that he suffered some impairment of his mental faculties, but disagreed sharply over the nature and extent of that impairment. With this general observation in mind, we begin by reviewing the expert testimony introduced by the defendant.

Billingsley's first expert was Dr. Marvin Ziporyn, a psychiatrist who testified both at the fitness hearing and at trial. The information Dr. Ziporyn used in assessing Billingsley included neurological and psychological tests performed by other doctors,[16] along with a physical examination, a "formal mental status examination," [17] and an "open-ended dialogue with Billingsley," conducted by Dr. Ziporyn himself. Based on these indices, Dr. Ziporyn concluded that Billingsley had an organic brain disease called "cortical atrophy," or more simply, a shrinkage of the cortex of the brain, which controls "abstract thinking, reasoning, judgment, [and] memory." Dr. Ziporyn further found that this atrophy was caused by such factors as prior injuries to the head, along with Billingsley's alcohol abuse and his various cardiovascular problems, and that the atrophy was manifested in Billingsley's impaired judgment, defects in memory, problems in concentration and retention, and a general tendency to become loose and tangential in his speech.[18] Beyond his general psychological testing, Dr. Ziporyn stated that he tried to question Billingsley on two occasions about his specific legal problems and the charges against him, and found that he could not give "a clear answer." From these tests and observations, Dr. Ziporyn concluded that the defendant was unfit for trial.

On cross-examination, Dr. Ziporyn admitted that the defendant did tell him that his legal problems "involved an accusation that he engaged in fraud in the comingling [sic] of funds." Further, he agreed that he had examined Billingsley only for slightly over two hours, and that he compiled no written

---

**15.** We recognize of course that there are a variety of potential explanations for Billingsley's problems on the stand other than flaws in basic mental capacity, such as lack of education, obstreperousness, or anxiety. We simply are not in a position to judge which of these explanations applies to the defendant. *Cf. United States v. Johns*, 728 F.2d 953, 957 (7th Cir.1984) ("Doubts raised by the defendant's actions, however, should not be resolved in favor of competency.").

**16.** Dr. Ziporyn reviewed the reports of Doctors Carl Schwartz and Robert Jeub, which contained data from a C.A.T. Scan, an electroen-

cephalogram (EEG), and a Bender Gestalt psychological test performed on Billingsley. Dr. Jeub testified at trial concerning his own conclusions based on those tests.

**17.** Dr. Ziporyn described the "formal mental status examination" as consisting of a series of questions designed to measure a person's "orientation as to time place and person, and clarity of concept of his present situation."

**18.** Dr. Ziporyn also testified, however, that he discovered "no major impairment of [defendant's] logical reasoning ability."

report or notes on his examination.[19] In response to the prosecutor's questions, Dr. Ziporyn stated that the psychological problems that he diagnosed after examining Billingsley would not necessarily be apparent to lay persons who dealt with Billingsley on a daily basis. The doctor testified that "many people would regard Mr. Billingsley as what is colloquially referred to as a 'character.'" Finally, Dr. Ziporyn testified that the formal mental status examination that he had performed would have revealed if Billingsley had been exaggerating or inventing symptoms because "the examination is so-constructed as to present ... 'trap questions' ... which an individual with an organic mental disorder should be able to answer correctly whereas individuals with other mental disorders might not do so."

The defendant's other expert was Dr. Robert Jeub, a medical doctor with a specialty in neurology and psychiatry who testified at trial concerning Billingsley's general mental health as well as his ability to understand the 1965 order. Dr. Jeub based his evaluations on such factors as a Bender Gestalt psychological test performed by his associate Dr. Carl Schwartz (who referred Billingsley to him); a C.A.T. Scan, an EEG, and various neurological and physical examinations that he conducted himself; and a medical history taken from the defendant. Dr. Jeub concluded from these sources that because of a variety of cardio-

vascular problems, Billingsley had developed "early cortical atrophy," which resulted in "mild cognitive impairment." Moreover, on the morning of the day that he testified (December 5), Dr. Jeub attempted to discuss the 1965 order with Billingsley. Based on this discussion and his prior tests, the doctor concluded generally that the damage to Billingsley's brain would affect his ability to understand the order, and particularly that Billingsley did not understand the order "in its entirety."[20]

The defendant's expert testimony on fitness was first contradicted by Dr. Aileen Thatcher, a psychologist who compiled a written report on Billingsley's fitness and later testified at trial. Dr. Thatcher's report was based upon her review of the records of Doctors Schwartz and Jeub, along with her own psychological testing and interviewing of Billingsley during two sessions totalling six and one-half hours.[21] More particularly, Dr. Thatcher gave Billingsley two key tests: the Minnesota Multiphasic Personality Inventory (MMPI), which she described as "a test that has numerous scales, designed to elicit malingering or an attempt to ... lie," and the Competency Screening Test, which she said was composed specifically of "questions regarding the patient's ability to cooperate with counsel and to understand court procedures."

The doctor concluded from the MMPI that Billingsley was "consciously exagger-

**19.** Dr. Ziporyn also agreed on cross-examination that at the time of the fitness examination Billingsley was on a medication called "Tranxene," and further that Tranxene is a drug that affects the central nervous system and mental alertness. When asked whether Billingsley's use of this drug, if combined with use of alcohol, "could have an impact on his responsiveness" to Dr. Ziporyn's questions during the fitness examination, however, Dr. Ziporyn responded only that: "It's theoretically possible." Dr. Ziporyn was never asked, and therefore never answered, whether Billingsley's use of Tranxene by itself would have significantly affected his responsiveness during the fitness examination, or whether Billingsley also had in fact ingested alcohol prior to the examination.

**20.** Dr. Jeub testified from his discussion of the 1965 order with Billingsley that

his description of what has taken place and his acknowledgment of these matters, which I directly confronted him with, was rather vague and really not those of an individual who would recognize the significance of this particular order.

**21.** As noted by the dissent, Billingsley also gave Dr. Thatcher "a detailed narrative account of his personal and professional background," which was recorded in the doctor's report. *See post* at 1033–1034. Included in Billingsley's account was discussion of what the dissent summarizes as Billingsley's "habit" of drinking between "one to two fifths of 'VO' per day." *Id.* at 1034 Dr. Thatcher's report states, however, that Billingsley claimed to have consumed this amount of alcohol "during his first marriage," which ended in divorce in 1975.

ating or inventing symptomatology," or malingering,[22] and from the Competency Screening Test that Billingsley "demonstrated an awareness and understanding of the nature and objectives of the proceedings, an understanding of the possible consequences of the proceedings, and an ability to cooperate with his attorney in his own defense." In addition, Dr. Thatcher testified at trial that she specifically discussed the 1965 order with Billingsley. While admitting that Billingsley did have some degree of cortical atrophy, and that he "claimed to have trouble remembering the specific charges against him" when she interviewed him, Dr. Thatcher offered the opinion that Billingsley was fit to stand trial and did understand the 1965 order.

Lastly, the government presented at trial the testimony of Dr. Erwin Baukus, a psychologist with training in neuropsychology. Dr. Baukus criticized the tests performed and the conclusions reached by Doctors Jeub and Ziporyn.[23] As preparation for his independent evaluation of Billingsley, Dr. Baukus reviewed the 1965 order, past medical reports from Dr. Jeub and others, and Dr. Thatcher's report on fitness. Most significantly, Dr. Baukus performed a series of neuropsychological tests on Billingsley during an approximately four-hour examination, including "the Luria-Nebraska Neuropsychological Test Battery, the Benton Revised Visual Retention Test, and several tests from the Halstead-Reitan Neuropsychological Test Battery."[24]

Based on this complex and comprehensive series of tests, Dr. Baukus concluded that Billingsley showed "some soft signs of inefficiency of functioning of the cortex," but that he nevertheless did not suffer from any significant loss of long or short-term memory, and that his mental faculties "are adequate to be able to understand a document such as the [1965] injunction." Dr. Baukus did not, however, discuss the 1965 order or related legal matters with Billingsley. Taken as a whole, Dr. Baukus's testimony, perhaps more than that of the other experts, demonstrates that the real issue is not whether Billingsley had some mental impairment, but how severe and pervasive that impairment was. Dr. Baukus admitted, for example, that one of the tests he performed indicated that Billingsley had difficulty with abstract reasoning, but concluded after reading the 1965 order that it was concrete enough that this difficulty would not affect Billingsley's ability to understand and comply with it. Dr. Baukus also testified that Billingsley's below-average performance on some of the tests might be attributed to the fact that he has only an eighth-grade education.

### 2. Lay Testimony

Billingsley's primary lay witness[25] was his counsel, Robert Burke, who took the stand at the fitness hearing and gave narrative testimony based on his representation of Billingsley over an approximately two-year period. Burke stated that he had found Billingsley to be mentally deficient in three main areas: memory and retention, ability to concentrate, and understanding of the 1965 order and the charges arising

---

22. Dr. Thatcher added, however: "It should be cautioned that an exaggeration or invention of symptomatology does not preclude the existence of some psychopathology."

23. Dr. Baukus described the Bender Gestalt test, relied upon in part by Dr. Jeub, as an overly simplistic test that might yield misleading data. In addition, he characterized the formal mental status examination employed by Dr. Ziporyn as "just a series of questions that a psychiatrist, or physicians, generally use to determine the orientation of a person.... It's not a test per se, because there are no standards or norms, other than the subjective opinion of the physician who is administering it."

24. Dr. Thatcher described the Luria-Nebraska and Halstead-Reitan tests in her testimony as the only tests capable of revealing "how cortical atrophy is affecting the person."

25. The only other lay witness for Billingsley who gave testimony arguably pertinent to his mental capacity was Dorwin Barr, a cashier at a bank in which Billingsley had an account. Barr testified that he had noticed a deterioration in Billingsley's conduct of business during the last couple of years; for example, Billingsley had missed appointments and was generally forgetful.

from it. More particularly, Burke testified that Billingsley had repeatedly asked him the same questions about the 1965 order and the charges against him, and thus had demonstrated no capacity for remembering Burke's answers or for understanding what the order required of him generally. For these reasons, Burke expressed "genuine doubt as to whether [Billingsley] knows what is going on and can participate meaningfully in these proceedings."

At the fitness hearing and later at trial, the government presented testimony from Alan Schwingler, an insurance agent who over a number of years had sold Billingsley several insurance policies, and who also had purchased oil and gas interests from Billingsley. Schwingler testified that since he was first introduced to Billingsley in 1977, he had met with him approximately three to four times a month. Based on these dealings, Schwingler stated that he had discerned no inability on Billingsley's part to recall past events, reason coherently, think logically, understand documents, and so forth. Schwingler further testified that Billingsley had denied having any mental impairments on an application for a health insurance policy in 1980, and similarly had denied having been treated for mental disorders on an application for a life insurance policy in 1982.

Clay County State's Attorney Robin Todd also testified for the government at the fitness hearing from his past contact with the defendant. Todd stated that he had met Billingsley back in 1973, when Billingsley was the mayor of Clay City, Illinois, but since then generally had seen him only several times a year. The bulk of Todd's testimony focused on recent occasions when he had seen Billingsley appear in state court on a charge of "deceptive practice" arising from Billingsley's passing of bad checks. Specifically, Todd described Billingsley's appearance for arraignment in March 1982, his appearance at a bond reduction hearing in April 1983 in which he testified "extensively" about his assets and holdings, and finally his appearance at a September 1983 hearing in which he entered a negotiated guilty plea without ever raising a question as to his fitness. Todd concluded "in [his] professional judgment as a State's Attorney" that Billingsley was fit to stand trial.

The only remaining lay testimony relevant to Billingsley's fitness consists of testimony from six individuals who previously had purchased investments from him. Although their testimony contains little detail on the subject, each of these investors consistently observed that Billingsley's mental state seemed normal and that he seemed perfectly able to conduct business.

## C. Conclusion

Based on our review of the evidence, we cannot say that there is no reasonable possibility that the defendant would have been found unfit for trial if the burden of proof had been allocated to the government. The evidence on Billingsley's fitness is too close to allow us to determine, from a reading of the record alone,[26] that the misplacement of the burden was harmless error. As we said in *Bilyew:*

> The trial judge's conclusion was not necessarily in error since, as in most close decisions, there was substantial evidence to support either conclusion. But the conclusion might well have been different had the burden of proof been placed as required by due process. Thus the trial court's use of an unconstitutional burden of proof cannot be deemed harmless error in this case.

---

**26.** We recognize that the evidence could actually be less close than it appears from a cold record, based upon various factors (such as witness demeanor) that would lead the trial judge to credit some witnesses' testimony more than others. *See United States ex rel. Little v. Twomey,* 477 F.2d 767, 771 (7th Cir.) ("Especially when the question is one of the competency of an individual to stand trial, the cold transcript may not reflect one of the most important pieces of evidence available to the trier of fact—the individual's demeanor."), *cert. denied,* 414 U.S. 846, 94 S.Ct. 112, 38 L.Ed.2d 94 (1973). It is precisely because we do not have access to such factors, however, that our review must be limited to determining whether there was a reasonable possibility that the result would have been different.

*Bilyew,* 686 F.2d at 1246. *See also United States v. Hollis,* 569 F.2d 199, 203–04 (3d Cir.1977).

Our earlier review of the evidence largely speaks for itself in demonstrating a reasonable possibility that Billingsley would have been found unfit, but we write further to emphasize those factors we find most significant in reaching our conclusion. As to the expert testimony, we of course begin with the fact that the doctors were evenly split over whether the defendant suffered significant mental impairment. This fact alone makes us reluctant to reject Billingsley's claim of unfitness as outside the realm of reasonable possibility.[27] Looking beyond the doctors' conclusions to the data they used in reaching them, while the two doctors who testified for the government appear to have performed the more comprehensive and perhaps the better tests of Billingsley's general mental functioning, the doctors who testified for Billingsley seem to have explored more fully his specific understanding of the 1965 order and the charges against him in this case. Moreover, as explained above, much of the data that the doctors relied upon did not necessarily provide support for a conclusion of either fitness or unfitness, but rather was susceptible of various interpretations.

In contrast, the lay testimony, at least in sheer quantity, seems weighted toward a finding that Billingsley was fit for trial. Nevertheless, because defense counsel is in a unique position to evaluate the precise issues involved in a fitness determination—the defendant's ability to understand the relevant charges and to cooperate with counsel—this court has repeatedly granted special deference to counsel's opinion on the defendant's fitness for trial. *See, e.g., United States ex rel. Mireles v. Greer,* 736 F.2d 1160, 1165–66 (7th Cir.1984); *United States v. Metcalfe,* 698 F.2d 877, 882 (7th Cir.), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983); *United States ex rel. Rivers v. Franzen,* 692 F.2d 491, 500 (7th Cir.1982). *But see United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1011–12 (7th Cir.1984) ("bare assertion" by defense counsel that defendant was incompetent insufficient to raise bona fide doubt concerning competency). While it is true that in these cases the court was deferring to counsel's implicit or explicit conclusion that the defendant was fit for trial, the same logic requires deference to defense counsel's opposite conclusion in this case. *See United States v. David,* 511 F.2d 355, 360 (D.C.Cir.1975). Considering Burke's testimony in this light, the other lay testimony is not so overwhelming as to eliminate any reasonable possibility that Billingsley would have been found unfit on the record as a whole. Furthermore, as the closeness and the equivocal character of the expert opinions suggest, the impairment that could have rendered Billingsley unfit for trial may have been too subtle to have been detected by lay observers.

We therefore remand to the district court to decide whether it can make a meaningful retrospective determination of Billingsley's fitness for trial and, if so, to make that determination in light of the requirement that the government prove him fit by a preponderance of the evidence. Because the proceedings on remand will be conducted before the same judge who heard the evidence and observed the witnesses at trial, and since the record relevant to Billingsley's fitness at trial is already rather extensive, the district court in its discretion might decide these questions without taking additional evidence or holding further hearings. In any event, if the court finds that the defendant was fit for trial, his conviction shall stand affirmed; but if the court finds that he was not fit, his convic-

---

**27.** We have not discussed or compared the doctors' individual qualifications because each has been accepted by the district court as qualified to render an expert opinion on fitness. Although the record does contain scattered references to questions about some of the doctors' credibility, subtle matters such as witness bias and credibility are better left to the sound discretion of the trial judge, whose evaluation is not restricted solely to a written transcript.

tion must be set aside.[28] *See United States v. Johns,* 728 F.2d at 958 (prescribing this procedure). We further emphasize that by remanding the case on the question of fitness, we do not in any way mean to suggest that the district court's conclusion that Billingsley was fit is not supported by the record, or that it would be inappropriate for the court to reaffirm that conclusion after allocating the burden of proof to the government. We simply decline to reweigh the evidence ourselves, leaving this task to the district court. Circuit Rule 18 shall not apply on remand.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's well-reasoned analysis in section II of the opinion that the trial judge did not err in instructing the jury to continue deliberations after he was unable to contact the defendant's counsel concerning a question submitted by the jury. I respectfully dissent from the majority's conclusion in section III of the opinion that the highly capable, well-respected, and experienced trial judge improperly found the defendant competent to stand trial. I share the majority's concern that compentency hearings are an important element of the judicial process and must be conducted with fairness and accuracy. *See United States v. Gutman,* 725 F.2d 417, 422–36 (7th Cir.) (Coffey, J., dissenting), *cert. denied,* —— U.S. ——, 105 S.Ct. 244, 83 L.Ed.2d 183 (1984). In the present case, however, the record clearly reveals that the Government introduced more than ample evidence to establish that Billingsley was, in fact, competent to stand trial.

I

The record reveals that the plaintiff, Robert Billingsley, consented to the entry of a permanent injunction in April 1965, prohibiting him from offering or selling securities unless registered with the Securi-

ties and Exchange Commission ("SEC"), or exempt from registration. On September 27, 1982, the United States District Court for the Southern District of Illinois issued an order to show cause why Billingsley should not be held in contempt of court for violating the 1965 injunction. In October 1982, the contempt proceeding was transferred to the Northern District of Illinois and on May 16, 1983, Billingsley's defense counsel filed a motion for continuance based upon a telegram that he had received the previous day, May 15, from Billingsley's privately retained psychiatrist, Dr. Carl Schwartz, stating that:

"I am a forensic psychiatrist and physician and have consulted for several hours with your client, Mr. Robert Billingsley. He is quite emotionally disturbed and suffers from severe diastolic arterial hypertension. Psychiatric symptoms include depression, agitation, memory lapses, insomnia and severe irritability. Progression of symptoms over the past year suggests serious consideration of psychiatric and medical hospitalization to avoid nervous breakdown and heart attack. His current legal situation is a definite aggravation. Court appearances would jeopardize his mental and physical health. If at all possible postponement of any active court participation is advised for at least three to four months. Six months preferably."

On September 13, 1983, Billingsley appeared in the Circuit Court of Clay County, Illinois, represented by a different defense counsel, and voluntarily pled guilty to a separate and independent charge of issuing fraudulent checks. At the guilty plea hearing Billingsley never informed the Illinois trial judge of Dr. Schwartz's May 15 telegram and neither Billingsley nor his defense raised the issue of competency. Moreover, the Illinois trial judge thoroughly questioned Billingsley concerning the voluntariness of his plea, the consequences of his decision, the adequacy of representa-

---

**28.** If for some reason the court should find as a threshold matter that it cannot make a meaningful retrospective fitness determination, the defendant's conviction should be vacated, and he can be retried if and when he is found fit for trial. *United States v. Johns,* 728 F.2d 953, 958 (7th Cir.1984).

tion by defense counsel, and his understanding of the proceeding, and at no time did the judge observe any signs of incompetency. Nonetheless, the following day, September 14, 1983, just five days before the SEC contempt proceeding was scheduled to commence, Billingsley filed a motion in Federal court requesting an evidentiary hearing to determine if he was competent to stand trial. The Federal trial judge, completely unaware of Billingsley's voluntary guilty plea in Illinois state court the day previous and his obvious strategy to further delay the SEC contempt proceeding, granted the motion and scheduled a hearing for October 6, 1983.

At the October 6 hearing, the defense counsel informed the court that the only purpose of the proceeding was to determine if there existed sufficient evidence to conduct a full-blown competency hearing at a later date. The defense counsel further stated that:

> "I believe the plaintiff's attorneys also concur that the burden would be upon them, at such a [competency] hearing, to proof [sic] that the defendant's competency—the defendant is competent to stand trial. This burden is one which must be met by a preponderance of the evidence. The question of competency would be for the Court to decide."

The trial judge responded that "[a]fter I hear the [testimony], I will determine whether I need the evidence or opinion of another psychiatrist or we will accept the recommendations of the Government as to whether they think they need one." Thus, the trial judge, as well as the parties, realized that in the event Billingsley introduced sufficient evidence of incompetency at the October 6 hearing to proceed with a full-blown competency hearing, the Government would have the ultimate burden of establishing that the defendant was, in fact, competent to stand trial. The sole purpose of the October 6 hearing was to allow Billingsley to introduce that quantum of evidence necessary to persuade the court to conduct a full-blown competency hearing at a later date.

Billingsley retained a second psychiatrist, Dr. Marvin Ziporyn, for the sole purpose of testifying at the October 6 hearing. Dr. Ziporyn informed the court that he had examined Billingsley for a two-hour period but had taken no notes to refresh his recollection and had prepared no formal report to file with the court. Dr. Ziporyn testified that he administered a "formal mental-status examination"; interviewed Billingsley to test his short-term recall, ability to calculate, and spatial awareness; reviewed the results of an electroencephalogram and CAT scan administered by a Dr. Robert Jeub; and inspected the medical data compiled by Dr. Schwartz concerning Billingsley's emotional condition. Dr. Ziporyn observed "defects in memory; ... impairment of judgment; ... difficulty in concentration; ... problems with retention." Dr. Ziporyn acknowledged, on cross-examination, that at the time of the two-hour examination, Billingsley had a nervous condition that was being treated with prescribed medications which affected his central nervous system as well as his mental alertness. Moreover, Dr. Ziporyn admitted that "there is no major impairment of [Billingsley's] logical reasoning ability." Based upon his limited two-hour observation and his interpretation of the CAT scan, Dr. Ziporyn concluded that Billingsley was suffering from " 'cortical atrophy,' which means a diminution or shrinkage of that part of the brain known as the 'cortex'; the cortex is an area of the brain which is responsible for abstract thinking, reasoning, judgment, memory." Dr. Ziporyn believed that Billingsley's condition was caused by:

> "a number of very severe injuries to his head, including a skull fracture and several concussions, and this has caused permanent damage—that is to say, damage that is not reversible.

> In addition, he has compounded the problem, over the years, by prolonged ingestion of alcohol. He went for a period of four years where he was ingesting about a pint of whiskey a day.

These two factors, operating in tandem, have resulted in shrinkage of the cortex or damage to the brain."

Dr. Ziporyn failed to explain the apparent contradiction between his conclusion that Billingsley suffered from "cortical atrophy" and his observation that Billingsley manifested "no major impairment of his logical reasoning ability." Moreover, Dr. Ziporyn admitted that "the mere fact that a CAT scan may show cortical atrophy, in and of itself, does not mean that somebody is incompetent," but Dr. Ziporyn did not administer any medically approved, psychological examinations to substantiate his finding that the cortical atrophy shown on the CAT scan had actually affected Billingsley's capacity to reason, concentrate, and formulate judgments. I further note that Dr. Ziporyn's conclusion made no reference to the fact that Billingsley's mental alertness was obviously affected by the prescribed medications he was ingesting for his nervous condition. Moreover, the only formal psychiatric test that Dr. Ziporyn administered was a mental-status examination which positively revealed that Billingsley was "oriented as to time, place and person." Despite these glaring contradictions, Dr. Ziporyn was of the opinion that Billingsley did not comprehend the contempt charges brought by the SEC, was not capable of rationally understanding his defense counsel, and was not competent to stand trial.

Following Dr. Ziporyn's testimony, the trial judge found that:

"I must say that the testimony of Dr. Ziporyn, while it establishes a basis for the conclusion that Mr. Billingsley may not be competent to stand trial, I do not regard it as a completely satisfying opinion to reach that conclusion.

And, therefore, I wonder what the Government intends to do."

The court advised the Government that "I would like to hear one other opinion ... either a Court-appointed examiner or one that [the Government] would procure." The Government responded that it had two out-of-town witnesses present in court who were prepared to testify that they observed "nothing out of the ordinary" in Billingsley's behavior. The court agreed to hear the testimony of these witnesses rather than further delay the proceedings until a Government selected medical expert could examine Billingsley.

Before the Government witnesses testified, Billingsley's defense counsel informed the court, under oath, that Billingsley evidenced a lack of memory and retention, and "apparently, has no capacity for remembering what I'm telling him. . . ." The defense counsel added that Billingsley also evidenced an inability to concentrate as he would just "star[e] off into the distance [or] interrupt ... in the middle of sentences, going off completely on unrelated subjects." As a result, the defense counsel stated that "I am not satisfied that he understands either the 1965 order or the present charges that are pending against him." Following the defense counsel's remarks, the Government questioned Billingsley's neighbor, Alan Schwingler, an insurance agent who had issued some forty policies to Billingsley since the summer of 1977 and had met with him an average of three or four times a month during that period. Schwingler testified that in August 1980, Billingsley applied for a health insurance policy, stating on his application that within the past ten years he did not suffer from any mental or nervous disorders and that he had no mental impairments. Similarly, in March 1982, Billingsley applied for another health insurance policy, again stating on his application that he had never been treated for a mental or nervous disorder and that his only treatment by a physician within the past five years was in August 1981, for an infected toenail. Schwingler added that in his opinion there was "no question" that Billingsley was able to understand and comprehend what he was doing and what was going on around him.

The Government also questioned Robin Todd, the State's Attorney for Clay County, Illinois, who had known Billingsley since 1973. Todd testified that in January

1981, the Clay County State's Attorney's Office charged Billingsley with "deceptive practices"—issuing fraudulent checks. Todd explained that on September 13, 1983, the day previous to Billingsley's filing a motion for a competency determination in the SEC contempt proceeding, Billingsley appeared in Clay County Circuit Court with a defense counsel, voluntarily waived a jury trial, and pled guilty to the charge of "deceptive practices" in open court. Before accepting the guilty plea, the Illinois trial judge questioned Billingsley concerning the voluntariness of his plea, the consequences of his decision, the adequacy of representation by defense counsel, and his understanding of the proceeding. Billingsley responded to each of the questions in the affirmative, assuring the court that he fully understood and comprehended the nature and implications of his guilty plea. Moreover, Billingsley's demeanor and actions in the courtroom failed to raise any suspicion in the mind of the trial judge, the defense counsel, or Todd that Billingsley was incompetent to voluntarily and knowingly enter the guilty plea. Indeed, Todd "saw nothing at any time in my contact with Mr. Billingsley or any observations or anything that was reported to me by anyone else to indicate that there was any problem with Mr. Billingsley's competency."

At the close of Todd's testimony, the defense counsel reiterated that the sole purpose of the October 6 hearing was "for the Court simply to rule at this time whether there is some question of competency, sufficient to warrant a hearing...." The district court judge responded:

> "what I have heard, to this point, suggests to me that I do not find your burden of proving [Billingsley's] lack of competence to stand trial having been met. But I have some reservation on the subject, which would cause me to want to hear some other expert, other than the doctor we heard this morning.
>
> Have you arranged for an examination of Mr. Billingsley, on the side of the Government?
>
> \* \* \* \* \* \*

> I would like one further examination.
>
> When we get that doctor's report, if you wish a hearing, so that you can examine that doctor, we will have it; and if you wish to produce Mr. Billingsley, at that time, we will—I will be glad to let him testify and let the Government cross examine him."

Thus, at the close of the October 6 hearing, the district court's express and sole direction to the parties was to have the Government select a medical expert to examine Billingsley and then to allow Billingsley to question the expert's report and testify on his own behalf, if he so desired.

In accord with the court's request to conduct an independent review of Billingsley's competency, the Government selected Dr. Aileen Thatcher, a Board certified psychologist, to examine Billingsley. On October 25, 1983, Dr. Thatcher personally observed, clinically tested, and psychologically evaluated Billingsley for some six-and-one-half hours to determine his "1. Fitness to stand trial, and 2. Need for mental treatment." Dr. Thatcher administered a battery of comprehensive, well-recognized, medically approved psychological tests including the Minnesota Multiphasic Personality Inventory and the Competency Screening Test, reviewed the clinical reports of Drs. Jeub and Schwartz, and thoroughly questioned Billingsley about his personal life and his understanding of the SEC contempt proceeding. Dr. Thatcher compiled her findings and conclusions in an eight-page report that was filed with the district court on November 4, 1983. According to Dr. Thatcher, the results of the Minnesota Multiphasic Personality Inventory "indicated the defendant was consciously exaggerating or inventing symptomatology.... Due to the extreme scores on the indices of malingering, it is likely that if any psychopathology exists it would not be as severe as that indicated on the clinical configuration." Furthermore, Billingsley "exceeded the criterion score needed to be judged competent" on the Competency Screening Test. According to Dr. Thatch-

er, Billingsley's performance on the Competency Screening Test "demonstrated an awareness and understanding of the nature and objectives of the proceedings, an understanding of the possible consequences of the proceedings, and an ability to cooperate with his attorney in his own defense." In addition, Billingsley provided Dr. Thatcher with a detailed narrative account of his personal and professional background, including his relationships with family members, his work experiences, his belief that the sale of securities did not violate the SEC injunction, his nervous condition, and his habit of consuming between "one to two fifths of 'VO' per day."

Throughout the entire examination period, Billingsley evidenced no telltale signs of incompetency. Indeed, Dr. Thatcher found that during the interview, Billingsley:

"was lucid throughout. There was no trace of a formal thought disorder or of delusional thought content although some suspiciousness, possibly appropriate under the circumstances, was evident.

\* \* \* \* \* \*

No difficulties, of any substance, were noted in his memory, concentration or attention. He was able, after two hours, to recall two items that were hidden and one of two names told him as a test of his memory. His ability to abstract, as measured by his understanding of proverbs and analogies, was fair.

Questions on the elements of the criminal justice and trial process systems were accurately answered by the defendant, although he claimed to have trouble remembering the specific charge against him. He indicated his awareness of the pleadings available to him, his knowledge of the possible sentences and of the roles of the judge, jury, prosecutor, and defense in the trial process."

Based upon the totality of these findings, Dr. Thatcher concluded that:

"A. *Fitness to Stand Trial:* Based on the comprehensive assessment summarized above, combined with a review of the documents noted, it is my opinion, to a reasonable degree of psychological certainty, that *the defendant is currently psychologically fit to stand trial.* He is able to assist in his own defense, is familiar with the roles and responsibilities of various courtroom participants, has a rational understanding of the nature and purpose of the proceedings against him and the possible penalties, and is motivated to act in the self-serving manner needed to assist his counsel in his defense.

B. *Need for Treatment:* The defendant is not in need of inpatient treatment and is not subject to involuntary hospitalization according to statutory criteria. He would benefit from psychological treatment to assist him in dealing with the depression, anger and insomnia he is experiencing as a result of his current legal situation."

(Emphasis added). Billingsley never requested a hearing to challenge Dr. Thatcher's clinically supported findings and conclusions, nor did he appear before the trial court to present testimony on his own behalf. Thus, on November 4, 1983, the highly capable, well-respected, and experienced trial judge found, based upon Dr. Thatcher's detailed report, that "defendant, Robert H. Billingsley, is presently psychologically fit to stand trial." The issue before this court is whether the district court erred in finding the defendant competent to stand trial.

II

In *United States ex rel. Bilyew v. Franzen,* 686 F.2d 1238 (7th Cir.1982) ("*Bilyew*"), this court set forth the basic proposition of law that "the Fourteenth Amendment requires the State or federal prosecution to shoulder the burden of proving that the defendant is fit to stand trial once the issue of unfitness has been properly raised." 686 F.2d at 1244. Indeed, it would be unreasonable "to impose upon [the defendant] the burden of proving his own incompetence, for the very disability which he would be seeking to prove renders him incapable, either logically or legal-

ly, of sustaining the burden of proof." *Id.* at 1245 (quoting *People v. Bender*, 20 Ill.2d 45, 53–54, 169 N.E.2d 328, 332 (1960)). In the present case, the majority concludes that the district court improperly placed the burden upon the defendant to prove his incompetency to stand trial. The majority further reasons that "[t]he evidence on Billingsley's fitness is too close to allow us to determine, from a reading of the record alone, that the misplacement of the burden was harmless error." (Footnote omitted). I dissent from the majority's failure to scrutinize the record in this case which clearly reveals that the Government did, in fact, satisfy its burden of proving that Billingsley was competent to stand trial. I further dissent from the majority's reluctance to rule that there is a lack of substantial evidence to support a finding of incompetency, especially when one considers that Billingsley requested a competency hearing in the SEC contempt proceeding just one day after he voluntarily, intelligently, and knowingly waived a jury trial and pled guilty to the charge of "deceptive practices" without ever raising the issue of competency.

According to the record, the district court, as well as the parties, understood that the purpose of the October 6 hearing was simply to allow Billingsley to present that quantum of evidence necessary to persuade the court to conduct a full-blown competency hearing at a later date. The trial judge properly acknowledged that "[a]fter I hear the [testimony of Billingsley's psychiatrist], I will determine whether I need the evidence or opinion of another psychiatrist or we will accept the recommendations of the Government as to whether they think they need one." There is no question in this record, and indeed there never was any question before the trial court, that the Government carried the ultimate burden of persuasion on Billingsley's competency to stand trial. The parties agreed that if Billingsley introduced sufficient evidence of incompetency at the October 6 hearing, then "the burden would be upon [the Government] ... to proof [sic] that the defendant's competency—the de-

fendant is competent to stand trial." Following the October 6 hearing, the trial judge concluded that "I have some reservation on the subject [of Billingsley's competency], which would cause me to want to hear some other expert, other than the doctor we heard this morning." The trial judge, in effect, ruled that Billingsley had introduced sufficient evidence to raise the issue of incompetency and thus require the Government to present independent testimony establishing that Billingsley was, in fact, competent to stand trial.

The majority makes much of the fact that upon completion of the October 6 hearing, the trial judge informed the defense counsel that "I do not find your burden of proving [Billingsley's] lack of competence to stand trial having been met." Admittedly, these words were less than artfully chosen, as the ultimate burden of proving the defendant's competency to stand trial lies with the Government, once the issue of unfitness has been properly raised. Despite this inadvertent "slip of the tongue," the trial judge properly ordered the Government to present further testimony on the issue of competency and, by so doing, the trial judge required the Government to carry the ultimate burden of persuasion on the issue of Billingsley's competency to stand trial. At the close of the October 6 hearing, the trial judge directed the Government to introduce additional evidence because of "some reservation on the subject" of Billingsley's competency. Clearly, if the court believed that the ultimate burden of persuasion rested upon the defendant to show that he was incompetent to stand trial, it would have been illogical and completely inconsistent for the court to require the Government to introduce additional evidence. Instead, the trial judge's directions to the Government at the close of the October 6 hearing reveal that the defense had sufficiently raised the issue of competency to require the Government to establish that Billingsley was, in fact, competent to stand trial. Thus, unlike the majority, I conclude that once the issue of unfitness was raised at the October 6 hear-

ing, the highly capable, well-respected, experienced trial judge properly ordered the Government to establish Billingsley's competency to stand trial.

In response to the court's request, the Government selected Dr. Thatcher, a Board certified psychologist, who conducted a six-and-one-half hour examination of Billingsley, compiling her findings in an eight-page report that was submitted to the court. Dr. Thatcher concluded that Billingsley "is currently psychologically fit to stand trial." Billingsley made no attempt whatsoever to rebut this conclusion nor did he comply with the offer of the trial judge to appear in court and present testimony on his own behalf. Thus, based upon Dr. Thatcher's detailed report, the court found Billingsley "psychologically fit to stand trial." On appeal, this court will overturn a district court's finding that the defendant is competent to stand trial only if such a finding is clearly erroneous. *United States v. Johns*, 728 F.2d 953, 956 (7th Cir.1984) (citing *United States v. Voice*, 627 F.2d 138, 141 (8th Cir.1980)). In the present case, the district court's finding was not in error.

Billingsley's personal friend and insurance agent, Alan Schwingler, testified that he had been meeting with Billingsley three or four times a month for a period of some six years and there was "no question" in his mind that Billingsley was able to understand and comprehend what he was doing and what was going on around him. Moreover, Robin Todd, the attorney who prosecuted Billingsley for his fraudulent check scheme in Clay County, Illinois, testified that the day before Billingsley requested a competency hearing in the SEC contempt proceeding, Todd appeared in court with Billingsley and "saw nothing at any time in my contact with Mr. Billingsley or any other observations or anything that was reported to me by anyone else to indicate that there was any problem with Mr. Billingsley's competency." Dr. Thatcher personally observed, clinically tested, and psychologically evaluated Billingsley for six-and-one-half hours, administering two comprehensive, medically approved psychological tests including the Minnesota Multipha-

sic Personality Inventory and the Competency Screening Test, analyzing the clinical reports of Drs. Jeub and Schwartz, and thoroughly questioning Billingsley concerning his personal background and his understanding of the SEC contempt proceeding. Dr. Thatcher found that the results of the Minnesota Multiphasic Personality Inventory "indicated the defendant was consciously exaggerating or inventing symptomatology." Dr. Thatcher further found that Billingsley "exceeded the criterion score needed to be judged competent" on the Comprehensive Screening Test. Billingsley "demonstrated an awareness and understanding of the nature and objectives of the proceedings, an understanding of the possible consequences of the proceedings, and an ability to cooperate with his attorney in his own defense." He was able to explain the nature of the SEC contempt proceeding and to discuss his personal background in a detailed, coherent, and lucid fashion. Dr. Thatcher found that "[t]here was no trace of a formal thought disorder or of a delusional thought content.... No difficulties, of any substance, were noted in his memory, concentration or attention.... His ability to abstract, as measured by his understanding of proverbs and analogies, was fair.... Questions on the elements of the criminal justice and trial process systems were accurately answered by the defendant...." In view of this overwhelming evidence establishing that Billingsley was competent to stand trial, the trial judge properly concluded that Billingsley "is presently psychologically fit to stand trial."

I add that even if I were to agree with the majority and hold that the district court misallocated the burden of proof, which I do not, I would find such error harmless. According to this court's opinion in *Bilyew*, under a harmless error analysis, we must determine "whether there is a reasonable possibility that [the defendant] would have been found unfit had the State been given the burden of proving him fit." 686 F.2d at 1246. The majority asserts that "[t]he evidence on Billingsley's fitness is too close to allow us to determine, from a reading of

the record alone, that the misplacement of the burden was harmless error." I respectfully disagree. Based upon my reading of the record in the present case, the Government satisfied its burden of proving that Billingsley was competent to stand trial and there is no reasonable possibility that the trial judge would have found Billingsley unfit to stand trial. The only evidence to support a finding that Billingsley was incompetent to stand trial was presented by Dr. Ziporyn and Billingsley's defense counsel at the October 6 hearing. Dr. Ziporyn, a psychiatrist retained by Billingsley solely for the judicial proceeding, examined the defendant for only a brief two-hour period, took no notes to refresh his recollection, and prepared no formal report to file with the court. Dr. Ziporyn concluded that Billingsley experienced impaired memory, reason, and judgment due to a shrinkage of the cortex, but Dr. Ziporyn failed to establish that he had administered any type of psychological test to support this finding. This is a glaring oversight on Dr. Ziporyn's part, especially in view of his admission that "the mere fact that a CAT scan may show cortical atrophy, in and of itself, does not mean that somebody is incompetent."

In addition, Dr. Ziporyn contradicted his own diagnosis of impaired mental judgment with an admission that Billingsley manifested "no major impairment of his logical reasoning ability." The only formal psychiatric test that Dr. Ziporyn administered was a mental-status examination which positively revealed that Billingsley was "oriented as to time, place and person." On cross-examination, Dr. Ziporyn admitted that the medication Billingsley was ingesting for his nervous condition at the time of his examination affected his mental alertness. Dr. Ziporyn also admitted that this type of medication, when combined with Billingsley's excessive drinking, "could have an impact on his responsiveness to ... questions." It does not require the expertise of a physician or psychiatrist to realize that excessive alcohol consumption will compound the effects of medication prescribed for a nervous condition and cause an individual to be noticeably

nonresponsive. The combination of medication and alcohol easily explain Dr. Ziporyn's observation that Billingsley had "defects in memory; ... impairment of judgment; ... difficulty in concentration; ... problems with retention." The mixture of medication and alcohol likewise explains the defense counsel's testimony that Billingsley evidenced a lack of memory and retention as well as an inability to concentrate. The testimony of Dr. Ziporyn and the defense counsel, when coupled with the fact that Billingsley requested a competency hearing in the SEC contempt proceeding the day after he voluntarily, intelligently, and knowingly entered a guilty plea in Illinois state court without ever raising the issue of competency, reveals that Billingsley simply feared the SEC contempt proceeding and engaged in a calculated delaying tactic, typical of a nervous defendant facing prosecution.

Based upon the incomplete, contradictory, conclusory, and medically questionable testimony of Dr. Ziporyn and the defense counsel, the district court could not have found Billingsley incompetent to stand trial. The trial judge initially admitted to having "some reservation on the subject" of Billingsley's competency following the testimony of Dr. Ziporyn and the statement of defense counsel. As a result, the trial judge required the Government to present evidence concerning Billingsley's competency. The Government responded by introducing testimony from Alan Schwingler, Billingsley's personal friend and insurance agent, that "no question" existed as to Billingsley's ability to understand and comprehend what he was doing and what was going on around him. The Government also elicited testimony from Robin Todd, the attorney who prosecuted Billingsley for the fraudulent check scheme and who "saw nothing at any time in my contact with Mr. Billingsley or any other observations or anything that was reported to me by anyone else to indicate that there was any problem with Mr. Billingsley's competency." Moreover, Dr. Thatcher performed a thorough, six-and-one-half hour

psychological examination of Billingsley, administering the comprehensive, medically accepted Minnesota Multiphasic Personality Inventory and the Competency Screening Test, analyzing the clinical reports of Drs. Jeub and Schwartz, and conducting an exhaustive interview with Billingsley to learn of his personal background as well as his understanding of the SEC contempt proceeding. Based upon this detailed examination, Dr. Thatcher concluded that Billingsley:

"is currently psychologically fit to stand trial. He is able to assist in his own defense, is familiar with the roles and responsibilities of various courtroom participants, has a rational understanding of the nature and purpose of the proceedings against him and the possible penalties, and is motivated to act in the self-serving manner needed to assist his counsel in his defense."

Furthermore, Dr. Thatcher recognized, just as Dr. Schwartz had recognized in May 1982, that the SEC legal proceeding was placing Billingsley under a severe psychological and emotional strain. Thus, Dr. Thatcher concluded that Billingsley "would benefit from psychological treatment to assist him in dealing with the depression, anger and insomnia he is experiencing as a result of his current legal situation."

The majority admits in footnote 26 that the evidence presented on the issue of Billingsley's competency could differ "based upon various factors (such as witness demeanor) that would lead the trial judge to credit some witnesses' testimony more than others." I am convinced that the highly capable, well-respected, experienced trial judge did just what the majority suggests; observed the demeanor of those witnesses who testified, weighed their credibility, considered all the evidence presented, and properly ruled that Billingsley was competent to stand trial. In view of the totality of the evidence, Billingsley's medication and self-induced drinking habits severely affected his mental alertness and his fear of punishment resulting from the SEC contempt proceeding severely affected his emotional stability. Though such factors may have infringed upon Billingsley's ability to remember, concentrate, and make well-reasoned judgments, they certainly did not render him incompetent to stand trial. Indeed, a thorough review of the evidence, including the fact that Billingsley requested a competency hearing in the SEC contempt proceeding the day after he voluntarily, knowingly, and intelligently entered a guilty plea in Illinois state court without ever raising the issue of competency, confirms Dr. Thatcher's observation that Billingsley was a malingerer who engaged in a calculated delaying tactic simply to forestall the Government's prosecution. Thus, even if I were to agree with the majority that the trial judge misallocated the burden of proof, which I do not, such error was harmless because, based upon a review of all the evidence presented at the October 6 hearing, there is no reasonable possibility that the district court would have found Billingsley incompetent to stand trial.